UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Case No. 0:18-cv-2825-PAM-KMM |
| Petitioner, | |
| v. | **Report and Recommendation** |
| Patrick Kidd | |
| Respondent. | |

Patrick Kidd, the respondent in this matter, is currently incarcerated at FMC-Rochester. In October 2018 the government filed a petition to determine the present mental condition of Mr. Kidd pursuant to 18 U.S.C. § 4245. (ECF No. 1.) The Court recommends that the government's petition be GRANTED and that Mr. Kidd be committed to the custody of the United States Attorney General pursuant to 18 U.S.C. § 4245 for hospitalization and treatment until he is no longer in need of such custody for care and treatment.

**FACTS**

**I.   The Hearing**

Pursuant to 18 U.S.C. §§ 4245(c) and 4247(d), a hearing on the government's Petition, (Doc. 1), was held on December 20, 2018 at FMC-Rochester. Melissa Klein, Ph.D., LP, a Psychologist at FMC-Rochester, and John P. Daniels, M.D., a Psychiatrist at FMC-Rochester, testified on behalf of the government. Respondent

Patrick Kidd was present at the hearing and represented by counsel.   (Doc. 23 at 5:14–19.)

Counsel for the government and Mr. Kidd stipulated that Dr. Klein and Dr. Daniels are qualified to provide their expert opinion regarding Mr. Kidd's mental condition and treatment thereof.   (*Id.* at 9:15–20.)   They also stipulated to the admission of Mr. Kidd's Bureau of Prisons central file, medical records, and psychological records.   (*Id.* at 8:19–9:7.)   The Court accepted these documents into evidence as Exhibit D.   (*Id.*)   These documents are cited herein to the Bates numbers on Exhibit D.

## II.     History of Mental Illness During Incarceration

On October 24, 2011, Mr. Kidd pleaded guilty to one count of conspiracy to possess with intent to distribute crack cocaine, in violation of 21 U.S.C. § 846, by the United States District Court for the Southern District of Alabama.   (Doc. 1-1 at 1.) Mr. Kidd was committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 120 months.   (*Id.* at 2.)   The Bureau of Prisons calculates his good conduct release date to be August 19, 2019.   (Doc. 1-2 at 1.)

Mr. Kidd was initially designated to FCI-Oakdale (Louisiana) and was incarcerated there from February 2012 to September 2015.   (Doc. 9 at 1.)   Mr. Kidd was subsequently incarcerated at FCI-Manchester (Kentucky) from September 2014 to April 2015, FCI-Ashland (Kentucky) from April to September 2015, FCI-Fairton (New Jersey) from October 2015 to December 2016, FCI-Bennettsville (South

Carolina) from December 2016 to May 2017, FCI-Estill (South Carolina) from May 2017 to October 2017, and FCI-Butner (North Carolina) from October 2017 to April 2018. (*Id.*) After transfer through various other facilities, Mr. Kidd has been incarcerated at FMC-Rochester since July 2018. (*Id.*)

Mr. Kidd began to exhibit mental health symptoms, including possible paranoia, during his time at FCI-Fairton but he was not diagnosed with a mental health condition at that time. (Doc. 23 at 35:22–36:9; *see also* USA-001396.) After being transferred to FCI-Bennettsville, Mr. Kidd exhibited more notable mental health symptoms. (Doc. 23 at 36:10–22.) During his initial intake at FCI-Bennettsville, Mr. Kidd asked the psychologist to "turn off the app" inside his head, which he claimed had been broadcasting to a government official. (*See id.*; USA-001388.) He expressed similar delusions in subsequent clinical contacts with mental health care staff at the prison. (*See, e.g.*, USA-001387.) There, he was diagnosed with delusional disorder. (Doc. 23 at 38:7–9; USA-001386.)

Mr. Kidd's symptoms progressed after he was transferred to FCI-Estill. (*See* Doc. 23 at 38:12–39:4.) He expressed concern about "body taps," i.e., technology implanted in his body that he believes monitors his activities and reports to the government. (USA-001495.) In addition, Mr. Kidd was observed showering while completely clothed and carrying a trash can and talking to himself and inanimate objects. (*Id.*) Staff grew concerned about Mr. Kidd's hypervigilance to the sexuality of other inmates and staff, (Doc. 23 at 38:15–25), which led to a confrontation on July

3

5, 2017 where Mr. Kidd became agitated and aggressive toward prison staff. (USA-001478). Mr. Kidd was diagnosed with schizophrenia of an unspecified type. (*Id.*; Doc. 23 at 39:1–4.) Due to Mr. Kidd's difficulty adjusting to placement in the general population and statements that he fought inmates in the past to determine their sexuality, he was isolated in secure housing. (USA-001481–82.)

As Mr. Kidd's symptoms grew more severe, Bureau of Prisons officials adjusted his mental health care level accordingly. (Doc. 23 at 39:7–16.) After his diagnosis of schizophrenia and transition to a higher mental health care level, Mr. Kidd was transferred from FCI-Estill to FCI-Butner. (*Id.*) He remained isolated in secure housing out of concern for his obsession with determining the sexuality of other inmates and his expressed willingness to use violence to make that determination. (Doc. 23 at 39:19–40:2; USA-001435–36.) Mr. Kidd's diagnosis was confirmed as schizophrenia because he had now exhibited auditory hallucinations, disorganized speech, and disorganized behavior. (USA-001532; USA-001623.) Due to the severity of Mr. Kidd's symptoms, psychology staff at FCI-Butner recommended Mr. Kidd be transferred to an inpatient mental health setting for psychiatric treatment to minimize the risk he posed to others and to provide more robust programming options. (USA-001536.)

### III. Deterioration of Mr. Kidd's Mental Health

4

Mr. Kidd arrived at FMC-Rochester on July 10, 2018. (Doc. 9 at 12; USA-001615–16.) The team of mental health providers assigned to Mr. Kidd include Dr. Klein, a psychologist, Dr. Daniels, a psychiatrist, and nursing staff. (Doc. 23 at 11:19–12:4.) Both doctors provide mental health treatment to Mr. Kidd and have done so since his transfer to FMC-Rochester in July 2018. (*Id.* at 11:16; USA-001615–16 (Klein Initial Screening); USA-001228–30 (Daniels Initial Clinical Encounter).)

The FMC-Rochester treatment team confirmed Mr. Kidd's diagnosis of schizophrenia in September 2018. (Doc. 9 at 15–16; Doc. 23 at 17:6–10; USA-001580.) Specifically, Mr. Kidd is diagnosed with schizophrenia, multiple episodes, currently in acute episode. (*Id.*) Schizophrenia is a psychotic disorder listed in the Diagnostic and Statistical Manual of Mental Disorders, a guide practitioners use to review, assess, and diagnose patients with mental illness. (Doc. 23 at 23:25–24:3.) Schizophrenia is characterized by five domains of symptoms: hallucinations, delusions, disorganized thinking or speech, disorganized behavior, and negative symptoms. (*Id.* at 24:5–8; *see also* Doc. 9 at 16; USA-001580.) To meet the diagnostic criteria for schizophrenia, a person must exhibit symptoms in two or more of these domains for a significant portion of time during a one-month period, with one of the symptoms to include delusions, hallucinations, or disorganized speech. (Doc. 9 at 16.) In addition, continuous symptoms must persist for at least six months, and, for a significant time since onset, one or more major life areas must

5

be impaired. (*Id.*; *see also* Doc. 23 at 24:9–16.) Mr. Kidd exhibits clear symptoms of schizophrenia, including delusional beliefs, disorganized thinking, disorganized behaviors, and auditory hallucinations. (Doc. 9 at 16; Doc. 23 at 24:19–28:21; USA-001580.)

Delusional beliefs are fixed beliefs that an individual maintains even when there is no evidence to support that belief, or even if there is evidence contrary to that belief. (Doc. 23 at 25:5–8.) Mr. Kidd exhibits delusions of persecution and delusions of control. (*Id.* at 25:9–10; Doc. 9 at 16; USA-001580.) Mr. Kidd's belief that he is subjected to "body tap" technology that has been implanted by the government is an example of a persecutory delusion he holds. (Doc. 23 at 25:11–13.) For example, on intake at FMC-Rochester, Mr. Kidd requested medical intervention or a scan to locate the "body tap" technology, which he stated was controlled by the CIA. (*Id.* at 33:16–21.) Mr. Kidd's belief that the technology is capable of directing his behaviors is a delusion of control. (*Id.* at 25:13–23.) For example, Mr. Kidd has expressed his belief that the "body tap" technology controls his speech, language, movements, and facial expressions. (*Id.* at 25:1–4.)

Disorganization is unusual, atypical, or illogical speech or behavior. (*See id.* at 25:24–26:13.) Mr. Kidd's behaviors of going into the shower fully clothed or with a trash can exhibit disorganization. (*Id.*) Mr. Kidd has also exhibited disorganized speech by talking rapidly or incomprehensibly, at times rendering logical conversation impossible. (*Id.*)

An individual experiences hallucinations when they have a subjective perceptual experience without any objective external stimuli. (*See id.* at 26:17–19.) Mr. Kidd shows evidence of experiencing hallucinations, including talking to himself, reporting hearing voices coming through his vocal cords, speaking to a telephone without lifting the receiver, and engaging in gesticulations and speech that he attributes to cell phone frequencies. (*Id.* at 26:14–27:3.)

Mr. Kidd's functioning is significantly impaired as a result of these symptoms. (*Id.* at 27:4–21.) He has expressed significant distress and feels "tortured" by the "body tap" technology. (Doc. 9 at 16.) Additionally, his symptoms have resulted in incidents of aggression toward others in relation to his intense paranoid and persecutory delusions. (*Id.*; Doc. 23 at 28:22–30:13.) On August 24, 2018, Mr. Kidd threw a food tray out of the cell door food slot, striking an officer. (Doc. 9 at 15; Doc. 23 at 29:10–13; USA-001590.) When questioned by nursing staff about the incident, Mr. Kidd talked about being monitored by the CIA and having a lawsuit against the United States government, who he said was "torturing" him with wire taps on his body. (USA-001590.) On September 1, 2018, Mr. Kidd threw coffee at an officer through the cell door food slot. (Doc. 9 at 15; Doc. 23 at 29:14–16; USA-001586.) Afterward, Mr. Kidd stated that the officer "deserved every bit of it" after gesturing at a note on his door that said "turn the computer off, if I need something I will ask." (Doc. 9 at 15.) On September 7, 2018, Mr. Kidd again assaulted a corrections officer, this time by spitting in the officer's face while being escorted from

7

his cell for a shower.  (Doc. 9 at 15; Doc. 23 at 29:21–30:1; USA-001586.)  In the disciplinary process for these incidents, Mr. Kidd was adjudicated not responsible for his conduct due to mental illness.  (Doc. 23 at 29:17–19; 30:14–31:18.)

After the September 7 incident, Mr. Kidd was administered emergency psychiatric medications because the mental health treatment team determined he was gravely disabled and dangerous to staff as a result of his severe mental illness.  (Doc. 23 at 40:12–19; USA-001586.)  Mr. Kidd was emergently medicated again on September 13 due to persistent psychosis and escalation in agitation and threats of bodily injury toward staff.  (Doc. 23 at 42:8–11; USA-002232.)  On September 18, Mr. Kidd was placed on constant observation after requesting "suicide medicine." (*Id.*)  The next day he informed staff that he was not suicidal and just had a "bad technology day" the day before.  (*Id.*)

### IV.  Mr. Kidd's Refusal of Treatment

Mr. Kidd has no insight into his mental illness or need for treatment.  (Doc. 23 at 41:16–20.)  From the time of his admission to FMC-Rochester to present, Mr. Kidd has insisted he does not have mental disorder and has declined to consent to hospitalization for treatment.  (*Id.* at 33:22–24; 34:5–11, 16–19; 93:15–17.)  On September 15, Mr. Kidd began accepting a prescribed oral antipsychotic medication. (*Id.* at 42:12–15.)  Mr. Kidd stated that he accepted the medication to avoid another round of involuntary emergency medication, not because he believes it is helpful to his mental state.  (*Id.* at 42:16–24.)  However, Mr. Kidd has accepted oral

8

antipsychotic medication every day and agreed to one dosage increase. (Doc. 23 at 106:24–107:13, 110:18–111:9.) To this day, he remains in diagnostic and observation status, as he has not consented to hospitalization for treatment. And the medication he will accept is too low a dosage to optimally address Mr. Kidd's symptoms. (*See id.* at 111:5–14.)

Mr. Kidd has shown a very good response to the low dose of oral antipsychotic he is presently prescribed and accepting. (*Id.* at 42:25–43:44:2; 94:15–17.) Dr. Klein testified that Mr. Kidd's treatment team has 'seen improvements in Mr. Kidd's mental status, which is very encouraging, with the medication.' (Doc. 23 at 42:25–43:1.) Dr. Daniels likewise testified that 'globally[,] we greatly increase release planning and successful reentry with treatment[,]' and that he is 'very optimistic' that Mr. Kidd will be able to progress toward release planning if he were hospitalized at FMC-Rochester. (Doc. 23 at 95:1–96:6.) Dr. Daniels further acknowledged a marked change in Mr. Kidd's behavior from the time of his FMC-Rochester intake on July 11, 2018 to his behavior during the December 20, 2018 hearing, agreeing that Mr. Kidd had been able to sit quietly and respectfully throughout the hearing while listening to the testimony, and remarking that Mr. Kidd was 'doing great.' (Doc. 23 at 107:16–25.)

His symptoms are far from remission, however. (*Id.* at 42:25–43:44:2; 94:15–17.) Mr. Kidd's treating psychiatrist believes remission is possible but will require higher doses and different forms of medication than that he currently accepts. (*Id.* at 94:18–21.) Furthermore, while medication is a necessary treatment for

9

schizophrenia, it is not alone a sufficient treatment. (*Id.* at 95:6–8.) Because he has not agreed to be admitted for hospitalization and treatment, Mr. Kidd has not yet experienced or benefited from other therapeutic interventions that might be helpful to him, including evidence-based treatment regimens like illness management and recovery and cognitive behavioral therapy. (*Id.* at 44:9–45:9; 95:9–12.)

Hospitalization would also allow Mr. Kidd's treatment team to better organize and plan his care by initiating a formal treatment plan. (*Id.* at 45:25–46:18.) This would allow the treatment team and other staff at the institution to set goals and targeted interventions to support Mr. Kidd in achieving those goals. (*Id.*) Of late, Mr. Kidd has not been able to participate in programming like earning his GED or workforce preparation that would assist him in transitioning into the community upon his release. (*Id.* at 47:18–21.) His symptoms also serve as a barrier to his placement at a halfway house during the months leading up to his release. With his good-conduct release date approaching in August, time is of the essence to set these therapeutic and personal goals and take concrete steps toward achieving them. If hospitalized for treatment, Mr. Kidd will be more likely to be in a position to successfully transition to less restrictive housing at FMC-Rochester and the community at-large upon release. (*See id.* at 96:3–10.) Without these interventions, his condition would likely, at best, remain stable, or at worst, enter a more active phase of mental illness. (*Id.* at 46:19–47:3.) Dr. Klein testified that, while it is possible that Mr. Kidd could enter a phase of remission without hospitalization,

ultimately it is likely that he would have active phases of symptoms in the future if he is not hospitalized for treatment. (*Id.* at 47:4–7.)

## ANALYSIS

### I.     18 U.S.C. § 4245

Under 18 U.S.C. § 4245, a prisoner serving a sentence in federal prison "may not be transferred to a mental hospital without the prisoner's consent or a court order." *United States v. Watson*, 893 F.2d 970, 975 (8th Cir. 1990), *vacated in part on other grounds*, *United States v. Holmes*, 900 F.2d 1322 (8th Cir. 1990). If the prisoner objects, the government may petition for a hearing on the prisoner's present mental condition to determine "if there is reasonable cause to believe that the person may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4245(a).

To that end, the Court must determine: 1) whether Mr. Kidd has a mental disease or defect; 2) if so, whether he is in need of custody for care or treatment of that mental disease or defect; and 3) if so, whether FMC-Rochester is a suitable facility. 18 U.S.C. § 4245(d); *United States v. Horne*, 955 F. Supp. 1141, 1144 (D. Minn. 1997). The government bears the burden to show each of these by a preponderance of the evidence. *Id.*

### II.    Mr. Kidd's Need for Treatment

11

The Court concludes that the government has met its burden to show that Mr. Kidd has a mental disease or defect, in this case, schizophrenia, and is in need of custody at FMC-Rochester, a suitable facility for his care and treatment.

### A. Mr. Kidd Has Schizophrenia, a Mental Illness.

The evidence conclusively demonstrates that Mr. Kidd has schizophrenia, a mental illness. Uncontroverted testimony demonstrates that schizophrenia is a mental disease. At the hearing, Dr. Klein and Dr. Daniels testified that Mr. Kidd meets the diagnostic criterial for schizophrenia. Dr. Klein and Dr. Daniels both detailed Mr. Kidd's persistent delusions, disorganized speech, and disorganized behaviors. The doctors also detailed objective indicia that Mr. Kidd experiences hallucinations. This constellation of symptoms has persisted for at least six months.

It is plainly evident that Mr. Kidd's day-to-day life is impaired as a result of his symptoms of schizophrenia. Mr. Kidd reports that he feels harmed and "tortured" by the "body tap" technology. His delusions and hallucinations have led to aggressive incidents and made it difficult for him to adjust to living with others in a secured setting. Mr. Kidd has not been able to make progress on education and workforce training in recent years and remains isolated in secure housing due to his illness.

Based on the report of Drs. Klein and Daniels, and on their testimony and the record as a whole, the Court concludes that the government has satisfied its burden of

showing by a preponderance of the evidence that Mr. Kidd is suffering from schizophrenia, a mental disease.

### B. Mr. Kidd Is in Need of Custody for Care or Treatment of Schizophrenia.

The Court further concludes that Mr. Kidd is "in need of custody for care or treatment" of schizophrenia. Whether a person is in need of care or treatment is a question of fact for the Court. *Watson*, 893 F.2d at 976. Section 4245 does not expressly define the meaning of this phrase, but judicial decisions provide guidance.

In *Horne*, the court described a "continuum of need" ranging from "something that is merely beneficial to something that is absolutely required." 955 F. Supp. at 1147. Treatment crosses the threshold of "needed" if such treatment is "more than merely beneficial" to the prisoner. *Id*; *see also United States v. Eckerson*, 299 F.3d 913, 914 (8th Cir. 2002) (per curiam) (applying the legal standard adopted in *Horne* for determining whether an inmate is in need of treatment). The Eighth Circuit has held that need is established if treatment would enable a prisoner to function in the general prison population. *Watson,* 893 F.2d at 982 (commitment and treatment to restore a prisoner's ability to function in the general prison population is permissible).

The "in need of custody" threshold can also be met where "a prisoner whose mental illness was left untreated would pose a danger to himself or others if placed in the general prison population . . . ." *Horne*, 955 F. Supp. at 1149; *see also United States v. Clark,* 122 Fed. Appx. 282, 283 (8th Cir. 2005) (affirming granting of § 4245 petition

13

where the inmate's "paranoid and delusional thinking prevented him from making rational decisions about his medical care"). "A finding of dangerousness, however, is not required." *United States v. Riley*, No. 08-cv-171 (RHK/AJB), 2008 WL 974839, * 3 (D. Minn. April 8, 2008); *Horne,* 955 F. Supp. at 1147.

    Here, the government has established by a preponderance of the evidence that Mr. Kidd is in need of custody for care or treatment pursuant to § 4245. The doctors testified that Mr. Kidd's delusions have prevented him from, among other things: recognizing that he suffers from a psychological disease, adjusting to placement in less restrictive housing or the general prison population, participating in group or other therapies, and completing education and programmatic activities that would aid in his transition to the community upon release. Mr. Kidd has debilitating paranoid delusions that have caused him to attack prison staff and other inmates. As a result, he has been housed in seclusion for many months.

    Specifically, Mr. Kidd's lack of insight into his mental condition and refusal to consent to hospitalization for medication and treatment prevents him from meaningfully participating in his recovery. Mr. Kidd has accepted a low-dose oral antipsychotic medication since mid-September 2018. This treatment has benefitted Mr. Kidd, but his symptoms are not in remission. The record demonstrates that hospitalization for treatment is necessary for Mr. Kidd to regain the skills he needs for placement in less restrictive housing and for release to the community. Hospitalization will allow Kidd's treatment team to provide a stronger course of

14

medication to treat Mr. Kidd's symptoms and help him access therapeutic modalities to gain insight into his diagnosis and coping skills for managing this mental illness. These steps are absolutely necessary to enable Mr. Kidd to function on a less secluded housing unit at FMC-Rochester and prepare for transition to the community upon release.

The government has established by a preponderance of evidence that Mr. Kidd requires custody for care and treatment. Mr. Kidd's inability to function in the general prison population without treatment and the danger that he poses to himself and others as the result of his mental disease conclusively establish this conclusion. Hospitalization for further treatment would not merely benefit Mr. Kidd, it is necessary to enable him to prepare for successful release to less restrictive housing and supervision in the community later this year.

### C. FMC-Rochester Is a Suitable Facility for Custody for Care or Treatment.

The Court further concludes that FMC-Rochester is a suitable facility for Mr. Kidd's care and treatment. No contrary evidence was offered. Dr. Klein testified that FMC-Rochester is devoted to providing mental health care for severe and persistent mental disorders, and has the ability and the staffing to provide psychiatric care, psychological care, skilled nursing care and active programming to provide for the needs of individuals such as Mr. Kidd, who require mental health treatment. Dr. Klein explained the array of mental health care available to Mr. Kidd and described

the team approach to provide his care, which includes nursing staff, social work staff, psychological and psychiatric services, and program staff.   FMC-Rochester offers an array of treatment options and therapeutic options that the doctors testified would likely help Mr. Kidd gather insight into his mental illness and gain skills needed to successfully manage this diagnosis for the remainder of his incarceration and when released to supervision in the community.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, the Court recommends that:

1. The objections period for this report and recommendation be SHORTENED to seven days for objection and three days for any response due to Mr. Kidd's impending release date of August 2019.

2. The government's Petition to Determine the Present Mental Condition of an Imprisoned Person under 18 U.S.C. § 4245, (Doc. 1), be GRANTED.

3. The Court find that Mr. Kidd is a person with a mental disease or defect, is in need of custody for care or treatment of that mental disease or defect, and that FMC-Rochester is a suitable facility for such custody, care, and treatment; and

    4.     Mr. Kidd be committed to the custody of the United States Attorney General pursuant to 18 U.S.C. § 4245 for hospitalization and treatment until he is no longer in need of such custody for care and treatment.

Date: February 4, 2019                           *s/Katherine Menendez*
                                                                Katherine Menendez
                                                                 United States Magistrate Judge

    **Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

    Due to the timeline of Mr. Kidd's incarceration, any objection to this report and recommendation must be filed within seven (7) days. Any response to the objections must be filed within an additional three (3) days.   All objections and responses must comply with the word or line limits set for in LR 72.2(c).

    **Under Advisement Date:** This Report and Recommendation will be considered under advisement 7days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 3 days after the objections are filed; or (2) from the date a timely response is filed.